# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  60353-5-II |
| Respondent, | |
| v. | |
| MICHAEL WAYNE EMLER, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Michael W. Emler appeals his convictions for one count of first degree assault (domestic violence) and one count of second degree assault—both with deadly weapon sentencing enhancements.  Emler argues that there was insufficient evidence to support the jury's determination that his use of force was not lawful and that the trial court abused its discretion by failing to consider Emler's request for an exceptional sentence downward.  We disagree and affirm.

FACTS

A.    BACKGROUND

On May 22, 2022, law enforcement responded to an incident involving a stabbing and a shooting.  Emler's sister, Angela,[1] and her son, Andrew Miller, were talking and drinking beer in Angela's home.  After a conversation between Emler, Andrew,[2] and Angela, Emler chased Andrew

---

[1]  Because Angela Emler and Michael Emler share the same last name, we refer to Angela by her first name where necessary to avoid confusion.  We intend no disrespect.

[2]  Because Andrew Miller shares the same last name as Abbigail Miller, Angela's daughter, we refer to each by their first name where necessary to avoid confusion.  We intend no disrespect.

out of the home with a knife. Angela retrieved her gun and followed the two outside. Angela's former romantic partner and neighbor, Carlos Massena, arrived at the scene. Emler cut both Angela and Massena with the knife. Angela fired two warning shots into the ground then shot Emler in the stomach.

The State charged Emler by amended information with one count of first degree assault (domestic violence) and one count of second degree assault, both with deadly weapon sentencing enhancements. The case proceeded to a jury trial in August 2024.

B.      TRIAL

1.      Angela Emler's Testimony

Emler is Angela's younger brother. Angela lived in the same home as Emler until she was around 18 years old, while Emler continued living with their parents.

Around 2018, Angela moved into a triplex in Lakewood with her children. Angela's former boyfriend, Massena, lived in another unit of the triplex.

Around 2019-2020, Emler moved in with Angela after their parents died. Angela explained that she and Emler were not close, but she felt obligated to take care of him. Emler did not have a job, and he did not contribute anything to the home beyond occasionally cooking dinner and emptying the garbage.

In April 2022, the residents in the triplex, including Angela, received a notice to vacate because the landlord was remodeling the units. Angela did not intend for Emler to continue living with her.

On May 22, 2022, Angela's adult son, Andrew, visited Angela's home. Andrew and Angela chatted and drank beer. When Emler joined them, Andrew and Angela asked if Emler had

found a place to live. Emler sat and stared at them. Andrew told Emler that he needed to "grow up and get a job and do stuff for himself." 5 Verbatim Rep. of Proc. (VRP) (Aug. 26, 2024) at 2047. In response, Emler went to the kitchen, drank some beer, and grabbed a knife. Andrew was standing by the door, and Emler ran down the stairs and chased Andrew out of the home.

Angela retrieved her gun from her bedroom closet. Angela's adult daughter, Abbigail, entered the room, and Angela instructed Abbigail to stay in her room.

When Angela stepped outside, she saw Emler pacing on the grass. Angela watched Emler with the gun against her leg. Emler saw Angela and began walking towards her. With the gun still against her leg, Angela walked towards the road to where her car was parked. Emler raised his knife, and Angela raised her gun, telling him to back up. Emler "just st[ood] there." 5 VRP (Aug. 26, 2024) at 2063.

Angela acknowledged that her memories of the incident were "blotchy" and not in order. 5 VRP (Aug. 26, 2024) at 2063. However, Angela remembered Emler "coming at [her]" and cutting her arm. 5 VRP (Aug. 26, 2024) at 2063. Angela also recalled Emler stabbing her car with the knife, and she remembered Emler fighting with Massena.

Angela testified that she believed Massena arrived before Emler attacked her. She was holding the gun in her hand near her leg when Massena arrived. Angela believed Massena took her gun and set it near the garage door. Then, Emler "came swinging at [Angela], and [she] had to back up because he got [her] neck, [her] nose, [her] lips, and [her] chest." 5 VRP (Aug. 26, 2024) at 2065. When Angela tried to block herself, Emler cut her arm. Angela also remembered Massena and Emler fighting near the road.

3

At one point, Angela looked at her arm and realized she was losing a lot of blood. Angela squatted and reached for her gun, and Emler cut the back of her neck. Angela explained that she "couldn't really see straight" due to the blood loss, and she could hear people yelling but could not fully understand what they were saying. 5 VRP (Aug. 26, 2024) at 2070. Angela believed she heard Massena yell, "Shoot him," because Emler was cutting her. 5 VRP (Aug. 26, 2024) at 2071. Angela fired two warning shots at the ground, but Emler was still pursuing them, so Angela fired a third shot that hit Emler in the stomach.

During the incident, Angela sustained cuts to her nose, lips, throat, chest, wrist, forearm, the back of her arm, and the back of her neck. One of the cuts severed an artery and a nerve in her arm.

2.      Abbigail Miller's Testimony

Abbigail testified that leading up to the incident, she and her younger sister were getting ready to go to sleep. Abbigail heard a door slam, and she went to Angela's room. Angela told Abbigail to go to her room, but Abbigail went to the living room and looked out the window. Abbigail saw Angela and Andrew outside the triplex.

Abbigail eventually went outside, and she saw Emler chasing Angela with a knife, getting close to Angela and swinging the knife at her. Angela "told [Emler] to back up because he would keep going at her with the knife." 5 VRP (Aug. 26, 2024) at 2120. Abbigail explained that Angela put her arm up to block him from hitting her, and Emler cut her arm. Abbigail testified that this was the only time she saw Angela get cut and that Angela did not shoot until after the cut. Angela shot at the ground twice and then shot Emler in the stomach.

4

Abbigail also explained that at some point before Emler stabbed Angela, Abbigail saw Emler stab Angela's car windows with the knife. And Abbigail testified that it was getting dark outside and that there was a car between where she was standing and where Angela and Emler were, so she could only see portions of the incident.

3.      Carlos Massena's Testimony

Massena also lived in the triplex in 2022. Massena explained that his relationship with Angela had "cooled off" by the time of the incident, but the two were amicable and still spent time together. 6 VRP (Aug. 27, 2024) at 2515.

On the day of the incident, Massena borrowed Angela's car. When he returned, "everybody [was] outside[,] Angela ha[d] a gun out, and nobody [was] saying a word." 6 VRP (Aug. 27, 2024) at 2520. Massena noted that only Angela's family was around, so he disarmed Angela, threw the gun to the ground, and kicked it away.

Then, Massena saw that Emler was hitting the car. Massena approached Emler to see what he was doing and saw that Emler was stabbing the trunk and the roof of the car. Massena testified that before anyone said a word, Emler cut him on the forearm. Massena told Emler that he "f*cked up now," and Massena tried to punch Emler. 6 VRP (Aug. 27, 2024) at 2527. Massena missed and fell forward; Emler then stabbed Massena underneath his left arm.

Massena stood up and tried to step back, but he fell again. Massena crawled backwards as Emler came towards him. Then Angela, who was behind him, reached for the gun, and Emler began "slicing [Angela] as she picked [the gun] up." 6 VRP (Aug. 27, 2024) at 2528. Emler reached over Massena to get to Angela, and Massena could see Emler making stabbing motions

towards Angela. Massena explained "that's how she got so cut up." 6 VRP (Aug. 27, 2024) at 2528.

Massena testified that Angela fired two warning shots, and Massena screamed at Angela to "'[j]ust shoot the f*cker.'" 6 VRP (Aug. 27, 2024) at 2531. Angela shot Emler in the stomach.

When Massena turned towards Angela after she shot Emler, he saw blood squirting from her arm, so he and Andrew tried to address her injuries. Massena testified that Angela's artery was "partially sticking out of her" and that "it looked like she almost cut her arm completely off." 6 VRP (Aug. 27, 2024) at 2540, 2541.

4.      Conclusion of Trial

Prior to closing arguments, the trial court provided instructions to the jury. The jury instructions included an instruction stating that lawful force is a defense to first and second degree assault:

> It is a defense to a charge of Assault in the First Degree and Assault in the Second Degree that the force used was lawful as defined in this instruction.
>
> The use of force upon or toward the person of another is lawful when used by a person who reasonably believes that he is about to be injured in preventing or attempting to prevent an offense against the person, and when the force is not more than is necessary.
>
> The person using the force may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the person, taking into consideration all of the facts and circumstances known to the person at the time of and prior to the incident.
>
> The State has the burden of proving beyond a reasonable doubt that the force used by the defendant was not lawful. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty as to this charge.

Clerk's Papers at 67.

During closing arguments, the State contended that Emler assaulted Massena by stabbing him multiple times and that Emler intentionally stabbed Angela, who sustained very deep stab wounds while sitting on the ground. Emler argued that the State did not prove beyond a reasonable doubt that Emler did not act in self-defense.

The jury found Emler guilty of one count of first degree assault against a family or household member and while armed with a deadly weapon. The jury also found Emler guilty of one count of second degree assault while armed with a deadly weapon.

C.     SENTENCING

In Emler's sentencing memorandum, he requested an exceptional sentence downward based on two mitigating factors: (1) willing participant/initiator/aggressor and (2) impaired capacity to appreciate the wrongfulness of his conduct. Emler attached to his sentencing memorandum a forensic psychological report in support of his request.

At the sentencing hearing, the trial court stated that it was "not going to find there's a basis for an exceptional sentence downward." VRP (Sep. 20, 2024) at 11. The trial court reasoned that Emler armed himself and pursued Andrew out of the home, which drew Angela's attention and caused her to arm herself with a firearm. When Massena approached Emler to see what he was doing, Emler stabbed Massena. The trial court concluded that the events demonstrated the necessity of the shooting.

When discussing community custody, the trial court imposed a mental health evaluation and follow-up as a condition "based on the evaluation that was submitted." VRP (Sep. 20, 2024) at 13. The trial court stated: "It seems to me there's at least a general causal connection between

7

[Emler's] behavior and his diagnosed condition, but not one that leads me to believe there's a basis for an exceptional downward sentence." VRP (Sep. 20, 2024) at 13.

The trial court imposed a total of 166 months in custody.[3] The trial court also imposed 36 months of community custody for the first degree assault conviction and 18 months of community custody for the second degree assault conviction.

Emler appeals.

ANALYSIS

A. SUFFICIENCY OF THE EVIDENCE

Emler argues that the State presented insufficient evidence to prove that Emler's use of force was not lawful. We disagree.

1. Legal Principles

To determine whether evidence is sufficient to support a criminal conviction, the applicable inquiry is whether "'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Roberts*, 5 Wn.3d 222, 231, 572 P.3d 1191 (2025) (emphasis in original) (quoting *Jackson v. Virginia,* 443 U.S. 307, 318-19, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). "[J]udicial

---

[3] The trial court ordered 130 months in custody for the first degree assault conviction, to run concurrently with a sentence of 14 months for the second degree assault conviction. The trial court also imposed 24 months in custody for the deadly weapon sentencing enhancement related to the first degree assault, and 12 months for the deadly weapon sentencing enhancement related to the second degree assault, with the deadly weapon sentencing enhancement terms to be served consecutive to each other and to the base sentence.

review includes '*all of the evidence*' considered in a light most favorable to the prosecution." *Id.* (emphasis in original) (quoting *Jackson,* 443 U.S. at 318-19).

"When a criminal defendant challenges sufficiency of the evidence, 'all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant.'" *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)), *cert. denied*, 589 U.S. 1148 (2020). "'A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom.'" *Id.* (quoting *Salinas*, 119 Wn.2d at 201). "'Circumstantial evidence and direct evidence are equally reliable in determining the sufficiency of the evidence.'" *Id.* (internal quotation marks omitted) (quoting *State v. Kintz*, 169 Wn.2d 537, 551, 238 P.3d 470 (2010)).

### 2. Sufficient Evidence to Disprove Self-Defense

Emler argues that the State presented insufficient evidence to prove that Emler's use of force was not lawful because Emler's use of force was subjectively and objectively reasonable.

To convict Emler of first degree assault, the State had to prove that Emler, with intent to inflict great bodily harm, assaulted another with any deadly weapon or by any force or means likely to produce great bodily harm or death. *See* RCW 9A.36.011. To convict Emler of second degree assault, the State had to prove that Emler assaulted another with a deadly weapon. *See* RCW 9A.36.021.

Emler claimed self-defense, and the trial court instructed the jury on self-defense, which stated that the use of lawful force is a defense to first and second degree assault. "The use of force is lawful and justified where the defendant has a 'subjective, reasonable belief of imminent harm

from the victim.'" *State v. Grott*, 195 Wn.2d 256, 266, 458 P.3d 750 (2020) (quoting *State v. LeFaber*, 128 Wn.2d 896, 899, 913 P.2d 369 (1996), *abrogated on other grounds by State v. O'Hara*, 167 Wn.2d 91, 217 P.3d 756 (2009)). The use of force is lawful "[w]henever used by a party about to be injured . . . in preventing or attempting to prevent an offense against his or her person . . . [and] the force is not more than is necessary." RCW 9A.16.020(3); *see Grott*, 195 Wn.2d at 266.

"If the defendant meets the 'initial burden of producing some evidence that his or her actions occurred in circumstances amounting to self-defense,' then the State has the burden to prove the absence of self-defense beyond a reasonable doubt." *Id.* (quoting *State v. Riley*, 137 Wn.2d 904, 909, 910 n.2, 976 P.2d 624 (1999)).

Here, the State presented sufficient evidence for a rational trier of fact to find that Emler's use of force was not lawful. Angela's testimony showed that after a conversation about Emler's living situation, Emler grabbed a knife from the kitchen and chased Andrew out of the triplex. Massena's testimony showed that after he arrived at the triplex, Massena saw Emler hitting the car with a knife, and when Massena walked towards Emler to see what he was doing, Emler cut Massena in the forearm. Although Massena tried to punch Emler after Emler cut him with the knife, Massena missed and fell. Then Emler again stabbed Massena. Massena then tried to get away from Emler by crawling backwards. As Massena tried to crawl away, Emler kept coming towards Massena. Then Emler reached over Massena to slice at Angela, who was behind Massena, with the knife. At that point, Angela reached for the gun that Massena had taken away from her. Also, Abbigail testified to seeing Emler cut Angela's arm when Angela tried to block Emler from hitting her. Abbigail also testified that Angela fired the shots after Emler had cut her.

Viewing the evidence in the light most favorable to the State, there is sufficient evidence in the record to disprove beyond a reasonable doubt that Emler's force was lawful because Angela and Massena were not armed when Emler began cutting them with the knife. Also, Emler continued to cut Angela with the knife while Angela was behind Massena, who was trying to crawl away from Emler. Thus, when the evidence is viewed in the light most favorable to the State, a rational trier of fact could find that Emler did not subjectively or reasonably fear imminent harm and that Emler's use of force was not lawful. Accordingly, the State presented sufficient evidence to disprove Emler's self-defense claim beyond a reasonable doubt.

B.     REQUEST FOR EXCEPTIONAL SENTENCE

Next, Emler argues that the trial court "did not meaningfully consider whether [Emler] met the requirements for a mitigated exceptional sentence under RCW 9.94A.535(1)(e)," which allows for an exceptional sentence if the defendant's capacity to appreciate the wrongfulness of their conduct is significantly impaired. Br. of Appellant at 15. We disagree.

A criminal defendant generally cannot appeal a sentence within the standard sentencing range. RCW 9.94A.585(1); *State v. McFarland*, 189 Wn.2d 47, 56, 399 P.3d 1106 (2017). However, this prohibition does not extend to "'a party's right to challenge the underlying legal conclusions and determinations by which a court comes to apply a particular sentencing provision.'" *State v. Mandefero*, 14 Wn. App. 2d 825, 833, 473 P.3d 1239 (2020) (quoting *State v. Williams*, 149 Wn.2d 143, 147, 65 P.3d 1214 (2003)).

We review a trial court's decision to deny an exceptional sentence for abuse of discretion. *See State v. Grayson*, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005). "A trial court errs when 'it refuses categorically to impose an exceptional sentence below the standard range under any

11

circumstances' or when it operates under the 'mistaken belief that it did not have the discretion to impose a mitigated exceptional sentence for which [a defendant] may have been eligible.'" *McFarland*, 189 Wn.2d at 56 (alteration in original) (quoting *State v. Garcia-Martinez*, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997), *review denied*, 136 Wn.2d 1002 (1998); *In re Pers. Restraint of Mulholland*, 161 Wn.2d 322, 333, 166 P.3d 677 (2007)).

Emler argues that the trial court erred because it did not address Emler's request for an exceptional sentence downward based on Emler's mental illness and because the trial court did not address the forensic psychological report submitted with Emler's sentencing memorandum. However, here, the record shows that the trial court considered, but rejected, Emler's request when it concluded that it was "not going to find that there's a basis for an exceptional sentence downward." VRP (Sep. 20, 2024) at 11. Also, when discussing the community custody conditions, the trial court stated that it would impose a mental health evaluation as a condition "based on the evaluation that was submitted." VRP (Sep. 20, 2024) at 13. And the trial court further stated that "there's at least a general causal connection between [Emler's] behavior and his diagnosed condition, but not one that leads [the trial court] to believe there's a basis for an exceptional downward sentence." VRP (Sep. 20, 2024) at 13.

Thus, the trial court did not abuse its discretion because the court did not categorically refuse to impose an exceptional sentence nor operate under a mistaken belief that it lacked discretion to impose an exceptional sentence. Rather, the record shows that the trial court considered Emler's evaluation, but the trial court was not persuaded that Emler's evaluation provided a sufficient basis to impose an exceptional sentence downward.

CONCLUSION

Because sufficient evidence supported the jury's verdict and because the trial court did not abuse its discretion in declining to impose an exceptional sentence downward, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Lee, J.

We concur:

_____
Maxa, P.J.

_____
Che, J.